UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| WHITNEY NATIONAL BANK | * | CIVIL ACTION NO. 09-0059 |
| VERSUS | * | JUDGE DOHERTY |
| WILLIAM H. BOYLSTON | * | MAGISTRATE JUDGE HILL |

REPORT AND RECOMMENDATION
ON MOTION FOR SUMMARY JUDGMENT

Pending before the undersigned for Report and Recommendation is the Motion for

Summary Judgment filed by plaintiff, Whitney National Bank ("Whitney"), on May 24,

2010. [rec. doc. 85]. Oral argument was heard on July 21, 2010, after which the

undersigned took the motion under advisement. For the following reasons, I recommend

that the motion be **GRANTED**.

## Background

In the fall of 2000, William H. Bolyston ("Boylston"), a married psychiatrist from

Houston, Texas, responded to the ad of a male prostitute, Douglas Lormand ("Lormand"),

in the adult services section of the *Houston Press*, a newspaper known to cater to the gay

community in Houston. [rec. doc. 85, Exhibit B, Boylston deposition, p. 9]. For

approximately the next eight years, Boylston and Lorman conducted a sex-for-payment

relationship, which Boylston tried to conceal from his wife and children. [rec. doc. 85,

Exhibit B, pp. 11, 17, 25].

Sometime after Boylston and Lormand's relationship commenced, Lormand moved into the Houston home of Helen Kealey ("Kealey"). [rec. doc. 85, Exhibit B, p. 153]. Eventually, Lormand and Kealey moved to Louisiana, where Lormand's family lived. [rec. doc. 85, Exhibit B, p. 156]. Lormand and Kealey decided to purchase property on Congress Street in Lafayette, Louisiana as an investment. [rec. doc. 85, Exhibit B, p. 156]. Sometime after that project began, Lormand and Kealey's relationship ended, and Lormand convinced Boylston to buy Kealey out of the Congress Street property. [rec. doc. 85, Exhibit B, pp. 176, 181]. Boylston agreed.

Lormand told Boylston that he, Lormand, would introduce Boylston to Byron Breaux ("Breaux"), vice president and manager of commercial banking at Whitney, to make the financial arrangements. [rec. doc. 85, Exhibit B, p. 180]. Lormand had met Breaux at Red Lerille's health club in Lafayette in 2002 or 2003, and they had played tennis together. [rec. doc. 90, Exhibit A, p. 68]. On one occasion, Breaux spent the night at Lormand's home in Houston. [rec. doc. 90, Exhibit A, p. 69]. On several occasions, Lormand stayed at the home in Lafayette in which Breaux and his wife resided. *Id*.

A few years after meeting Breaux, Lormand arranged for Boylston and Breaux to play tennis in Houston. [rec. doc. 85, Exhibit B, pp. 52-54].[1] No business was discussed at that time. [rec. doc. 85, Exhibit B, p. 55]. This tennis match was the only time that Boylston had personal contact with Breaux. [rec. doc. 85, Exhibit B, p. 54].

---

[1]Bolyston testified that this meeting occurred in 2008, well after the loans which are the basis of this litigation were made. [rec. doc. 85, Exhibit B, p. 52].

By letter to Breaux dated January 11, 2006, Boylston sent to Whitney, as requested by Breaux, his personal financial statement in support of his, Boylston's, loan application. [rec. doc. 85, Exhibit H].   The financial statement showed Boylston had a net worth of over $2.8 million.  On April 21, 2006, Boylston executed a promissory note to Whitney in the amount of $220,000.00.  The purpose of that loan was to allow Boylston to substitute himself in place of Kealey on the note financing the Congress Street property, which he did.  [rec. doc. 85, Exhibit J].  Approximately six months later, the Congress Street property was sold, and the mortgage loan was paid off. [rec. doc. 85, Exhibit K].

On February 6, 2007, Boylston executed another promissory note to Whitney in the amount of $100,000 to secure a revolving line of credit.  [rec. doc. 85, Exhibit L]. Boylston used the money to invest in a real estate flipping business with Lormand.  [rec. doc. 85, Exhibit B, p. 220].  Boylston repaid the $60,000.00 draw which he had made on the credit line in August, 2007.

On February 16, 2007, Boylston, as a co-borrower with Lormand, executed a promissory note in the amount of $239,200.00 for the purchase of a townhouse at 1527 Lawrence Street in Houston ("Houston townhouse").  [rec. doc. 85, Exhibit M]. Whitney took a mortgage on the property to secure the loan

On the loan application, Boylston checked the blank indicating that he was unmarried. [rec. doc. 85, Exhibit B, pp. 85, 195].  Boylston also indicated on the application that the townhouse was going to be his primary residence, which was false.

Boylston appeared on the legal documents as a "single man" which was also, of course, false.  [rec. doc. 85, Exhibit B, pp. 86, 89].  In fact, Boylston was actually married and living in Houston with his wife at another address.  [rec. doc. 85, Exhibit B, p. 25].  Boylston did not want his wife to know that he was purchasing property with Lormand.  [rec. doc. 85, Exhibit B., pp. 200-01].

About a month after this loan closed, Whitney sold the mortgage on the secondary market to Chase Bank.  [rec. doc. 85, Exhibit G].

Approximately six months later, on September 7, 2007, Boylston executed another promissory note in order to increase his line of credit with Whitney from $100,000.00 to $250,000.00.  [rec. doc. 85, Exhibit A].   It is this note which is the subject of this litigation.  Under the terms of the note, Boylston promised to repay Whitney no later than September 6, 2008.  By cashier's checks payable to Chase Bank dated September 10, 2007, Whitney made two advances to Boylston on the September 7 note – one in the amount of $7,649.00 and the other for $239,594.99 – for a total of $247,243.99.  [rec. doc. 85, Exhibit C].  Both of these checks were endorsed on the reverse side by Boylston, who admitted that the signatures were his.  [rec. doc. 85, Exhibit B, p. 108].

About a month later, Chase Bank issued a release of the mortgage on the Houston townhouse.  [rec. doc. 85, Exhibit N].  Approximately two months after the release, Boylston transferred his interest in the townhouse to Lormand.

Boylston did not pay the outstanding balance due under the promissory note by the due date, September 6, 2008.  After negotiating with Whitney's representatives, Boylston executed an Allonge on October 24, 2008.  [rec. doc. 85, Exhibit D].  The Allonge amended the promissory note's term, extending the maturity date to December 6, 2008, with monthly interest payments beginning on October 6, 2008.  Boylston did not make any payment in accordance with the terms of the Allonge.

On November 10, 2008, Boylston received a letter from Whitney advising him that he was in breach of both the promissory note and the Allonge, and demanding payment in full.  [rec. doc. 85, Exhibits E, F].  Boylston admitted that he has not paid Whitney pursuant to the terms of the promissory note.  As of May 24, 2010, Boylston owed Whitney $246,644.14 in principal, $15,792.07 in accrued interest accumulating at a rate of $22.266465 per day, costs, and attorney's fees incurred in connection with this litigation.  [rec. doc. 85, Exhibit G].

On January 14, 2009, Whitney filed a Complaint in this Court against Boylston to collect the amount due under the note, plus interest, costs, and attorney's fees.  In response, Boylston alleged that he was fraudulently induced to make the note through a conspiracy between Lormand and Breaux.

This Court has jurisdiction pursuant to 28 U.S.C. § 1332.  Accordingly, Louisiana law applies.

## Summary Judgment Standard

Fed.R.Civ.Proc. Rule 56(c)(2) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.Proc. Rule 56(e)(2) provides, in pertinent part, as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

## Analysis

### 1. Promissory Note

Whitney has sued Boylston for collection of the September 7, 2007 promissory note in the amount of $250,000.00, plus interest, attorney's fees, and costs. Advances on the note in the amount of $246,644.14 were made by Whitney for Boylston's benefit.

Because of the relative simplicity of the issues involved, suits to enforce promissory notes "are among the most suitable classes of cases for summary judgement." *Colony Creek, Ltd. v. Resolution Trust Corp.*, 941 F.2d 1323, 1325 (5th Cir. 1991) (*citing Lloyd v. Lawrence*, 472 F.2d 313, 316 (5th Cir.1973)). The elements of an action for breach of a promissory note and guaranty are: 1) that the note and guaranty existed; 2) that defendants signed the note and guaranty; 3) that the plaintiff legally owned and held

the note and guaranty; 4) that default occurred; and 5) that a certain balance remains due and payable on the note. *Regions Bank v. Bonsai Sushi Downtown Lafayette, L.L.C.*, 2010 WL 2025517, at *3 (W.D. La. May 19, 2010) (Melançon, J) (*citing F.D.I.C. v. Foxwood Management Co.*, 15 F.3d 180 (5th Cir.1994). "Once the plaintiff, the holder of a promissory note, proves the maker's signature, or the maker admits it, the holder has made out his case by mere production of the note and is entitled to recover in the absence of any further evidence." *Premier Bank, Nat. Ass'n v. Perocomex*, 615 So.2d 41, 43 (La. App. 3ʳᵈ Cir. 1993). Once the plaintiff has met his burden of proof, the burden shifts to the defendant to prove the existence of a triable issue of fact. *Id*. (*citing American Bank v. Saxema*, 553 So.2d 836, 846 (La. App. 3ʳᵈ Cir. 1993)).

Here, Whitney has attached a copy of the promissory note in the amount of $250,000.00.  [rec. doc. 85, Exhibit A].  Also attached to the motion are copies of the cashier's checks drawn on Whitney, payable to Chase; these checks show the "Remitter" to be Boylston.  [rec. doc. 85, Exhibit B].  Boylston signed the back of these checks.  *Id*. Boylston admitted that the signature on the note was his.  [rec. doc. 85, Exhibit B, p. 93]. There is no dispute that Whitney legally owns and holds the note, that the advances were made on the note, that Boylston defaulted on the note and Allonge, and that the balance remains due and payable.  Thus, Whitney has met its burden of proof on this issue, and is entitled to judgment unless the plaintiff can show the existence of a triable issue of fact.

### *2. Conspiracy and Fraud*

Boylston seeks to avoid repayment of the note on the ground of fraud. Specifically, he alleges that Breaux and Lormand conspired to defraud him by convincing Boylston to pay off the mortgage on the Houston townhouse, and then transferring his ownership to Lormand so that Lormand could have the property free and clear.

The party who alleges that a conspiracy exists must prove an agreement between the alleged conspirators.  In other words, the party alleging the existence of a conspiracy "is required to establish a meeting of the minds or collusion between the parties for the purpose of committing wrongdoing."  *Thomas v. North 40 Land Development, Inc.*, 2004-0610 (La. App. 4 Cir. 1/26/05); 894 So.2d 1160, 1174  (*citing Guidry v. Bank of LaPlace*, 94-1758, p. 9 (La. App. 4 Cir. 9/15/95); 661 So.2d 1052, 1058; *see also Butz v. Lynch*, 97-2166 (La. App. 1 Cir. 4/8/98); 710 So.2d 1171, *writ denied*, 98-1247 (La. 6/19/98); 721 So.2d 473; *Walker v. America Honda Motor Company, Inc.*, 93-1659, p. 6 (La. App. 3 Cir. 6/1/94); 640 So.2d 794, 797, *writ denied*, 94-1741 (La. 10/7/94); 644 So.2d. 644.

In Louisiana, the actionable element is not the conspiracy itself.  Rather, it is the wrong which the conspirators agreed to perpetrate and commit.  *Butz*, 710 So.2d at 1174. Here, it is alleged by Boylston that the "wrong" which Lormand and Breaux conspired to commit was fraud.

Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to

the other. Fraud may also result from silence or inaction.  LA. CIV. CODE art. 1953.

Under Louisiana law, "[c]onsent of the parties is a requisite to the validity of a

contract, and there is no valid consent where it has been produced by error," such as

fraud.[2]  *D & J Tire, Inc. v. Hercules Tire & Rubber Co.,* 598 F.3d 200, 205 (5th Cir. 2010)

(*citing Sonnier v. Boudreaux*, 95-2127 (La. App. 1 Cir. 5/10/96); 673 So.2d 713, 717

(citing LA. CIV. CODE art. 1948)).  To prove fraud, a party must prove: "(1)

misrepresentation, suppression, or omission of true information; (2) the intent to obtain an

unjust advantage or to cause damage or inconvenience to another; and (3) the error

induced by a fraudulent act must relate to circumstances substantially influencing the

victim's consent to the contract."  *Id*. (*citing Simmons v. Clark*, 08-431 (La. App. 5 Cir.

1/27/09); 8 So.3d 102, 110)).

Here, Boylston alleges that Breaux and Lormand conspired to defraud him by

arranging the line of credit so that Boylston could pay off the mortgage on the Houston

townhouse and then transfer title (free and clear) to Lormand.

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91

L.Ed.2d 202 (1986), the Supreme Court held that a party opposing a properly supported

motion for summary judgment may not rest upon mere allegation or denials of his

pleading, but must set forth *specific facts* showing that there is a genuine issue for trial.

(emphasis added).  Specifically, the Court noted that a party cannot defeat a properly

---

[2]The contract here, of course, is the September 7, 2010 note.

supported summary judgment motion in a conspiracy case without offering "any

*significant probative evidence"* tending to support the claim.  (emphasis added).  *Id*., 477

U.S. at 257, 106 S.Ct. at 2514.

The only evidence of the conspiracy is Boylston's hearsay testimony and

Boylston's assumptions, set forth below:

> A.   The basics of this – this – this claim is that I've discovered, based on
> . . . Mr. Lormand, in explaining to me why – I said, why would Mr.
> Breaux give you whatever you wanted or give us whatever we
> wanted.  He – Mr. Breaux said because I can tell you in his marriage
> he used escorts to make a menage a trois, three, and that the wife
> learned that Mr. Breaux was more attracted to the male.  Mr.
> Lormand had this information and *I guess* used this as blackmail
> over Mr. Breaux like he used blackmail over me about my wife, and
> that's what he told me.  So then –
>
> Q.   I'm sorry.  Did – did Mr. Lormand tell you that he had used that
> information as blackmail against Mr. Breaux or *are you assuming* –
>
> A.   I'm –
>
> Q.   – you're *assuming* that he did the same to him he did to you?
>
> A.   *Yes*. . . . So then I began to see that the two – what – what Lormand
> could get from Breaux was to put him in the – in the hot seat about
> the blackmail . . .

(emphasis added).  [rec. doc. 85, pp. 61-62].

Here, Boylston has failed to present any specific admissible facts showing the

existence of a conspiracy.  His sole evidence is Lormand's "admission" that he conspired

with Breaux.  Breaux was not present when this "admission" was made.  By affidavit,

Breaux has expressly denied that he conspired with Lormand.  [rec. doc. 85, Exhibit I].

Other than Boylston's hearsay testimony (that is, what Lormand allegedly told Boylston about Breaux), there are no facts to support the conspiracy claim.

Given Boylston's painting of Lormand as a "con-man, prostitute and bank fraudster" [rec. doc. 90, p. 2], Lormand's statement allegedly made to Boylston about Breaux is suspect, at best. As stated in *Anderson*, "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion." *Id*. at 257 (*citing Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984)). Instead, a party must present *affirmative evidence* in order to defeat a properly supported motion for summary judgment. (emphasis added). *Id*. The undersigned finds that Boylston's testimony as to the existence of a conspiracy between Lormand and Breaux, without supporting proof, is insufficient to defeat summary judgment as a matter of law.

Furthermore, there is no evidence in this record that Boylston was induced to sign the note or obtain the advances as a result of fraud. The evidence is totally lacking of any "misrepresentation, suppression or omission of true information" which "induced" or "substantially influence[d]" Boylston to sign the note or authorize the advances on the note.

The record is absolutely devoid of any contact between Boylston and Breaux that could even remotely be characterized as fraudulent. It is for this reason, of course, that Boylson argues that Lormand conspired with Breaux, that is, so that Lormand's allegedly

fraudulent acts could be attributed to Breaux and thereby, Whitney.

As set out above, the proof of a conspiracy between Lormand and Breaux is utterly

lacking.  Furthermore, the proof of fraud by Lormand that induced Boylston to sign the

note and authorize the advances is utterly lacking.  The record is absolutely clear that

Boylston knew what he was doing when he signed the September 7 note.  There is no

evidence that he signed the note as a result of Lormand's "misrepresentation, suppression

or omission" of true information that substantially influenced Boylston.

Similarly, there is no proof in this record that Lormand misrepresented, suppressed

or omitted any fact which led to Boylston authorizing the advances on the note.

It appears clear to the undersigned that Lormand convinced Boylston to act to

Boylston's financial detriment, and that Lormand benefitted by, apparently, gaining

ownership of the Houston townhouse free and clear.  That does not make the financial

transactions that made this result possible fraudulent.  It certainly does not mean that the

holder of the note used to finance the transactions was in any way a participant in a

conspiracy to defraud Boylston.[3]

Proof of fraud in inducing Boylston to sign the note is absolutely lacking in this

---

[3]It must be remembered that Whitney is in the business of making loans.  Boylston's record of paying his obligations to Whitney was exemplary, and Whitney had a personal financial statement from Boylston showing a net worth of over $2.8 million.  Boylston was certainly credit worthy.

case.  Summary judgment on the note in favor of Whitney should therefore be granted.[4]

### 3. Clean Hands Doctrine

Finally, Whitney asserts that Boylston should be precluded from even asserting an

affirmative defense or counterclaim for fraud and/or conspiracy against Whitney because

he believed that he was benefitting from Lormand's alleged blackmail of Breaux.  This

argument is referred to as the "clean hands doctrine," and is explained as follows:

> [I]t is axiomatic that while a court of equity endeavors to promote and
> enforce justice, good faith, uprightness, fairness, and conscientiousness on
> the part of the parties who occupy a defensive position in judicial
> controversies, it no less stringently demands the same from the litigants
> who come before it as plaintiffs in such controversies. This fundamental
> principle is expressed in the maxim: 'He who comes into a court of equity
> must come with clean hands.' This doctrine universally affects the entire
> administration of equity jurisprudence as a system of remedies and remedial
> rights.

*Cimarex Energy Co. v. Mauboules*, 2009-1170 (La. 4/9/10); — So.3d. — , 2010 WL

1531363.

The doctrine of "clean hands" is an equity principle that requires that "he who

comes into a court of equity must come with clean hands." *City of New Orleans v. Levy*,

233 La. 844, 865, 98 So.2d 210, 218 (1957).  Louisiana courts can only turn to equity

principles to decide cases in the absence of express law.  *Edmonston v. A-Second*

*Mortgage Company of Slidell, Inc.*, 289 So.2d 116, 122 (La.1974).  A person cannot

---

[4]It seems that Boylston's real claim is that the Court should protect him from his own
folly in listening to Lormand, and in believing Lormand.  While the Court is sympathetic, there is
simply no basis for this Court to intervene.  While all may not be fair in love and war, unless the
law is breached, the Court cannot intervene.

maintain an action if, in order to establish his cause of action, he must rely in whole or in

part, on any illegal or immoral act or transaction to which he is a part.  *Allvend, Inc. v.*

*Payphone Commissions Co., Inc.*, 2000-0661 (La. App. 4 Cir. 5/23/01); 804 So.2d 27, 30;

*Guillie v. Comprehensive Addict. Programs*, Inc., 98-2605 (La. App. 4 Cir. 4/21/99); 735

So.2d 775, 779.

Whitney asserts that Boylston should not be allowed to assert fraud/conspiracy as a

defense or counterclaim because he admitted that he was benefitting from Lormand's

alleged blackmail of Breaux, and that he has come into court in these proceedings with

unclean hands.  The Court agrees.

In his deposition, Boylston testified that he believed that he was benefitting from

Lormand's blackmail of Breaux:

> A.    The basics of this – this – this claim is that I've discovered, based on
> . . . Mr. Lormand, in explaining to me why – I said, why would Mr.
> Breaux give you whatever you wanted or give us whatever we
> wanted.  He – Mr. Breaux said because I can tell you in his marriage
> he used escorts to make a menage a trois, three, and that the wife
> learned that Mr. Breaux was more attracted to the male.  Mr.
> Lormand had this information and I guess used this as blackmail
> over Mr. Breaux like he used blackmail over me about my wife, and
> that's what he told me.  So then –
>
> Q.    I'm sorry.  Did – did Mr. Lormand tell you that he had used that
> information as blackmail against Mr. Breaux or are you assuming –
>
> A.    I'm –
>
> Q.    – you're assuming that he did the same to him he did to you?
>
> A.    Yes. . . . So then I began to see that the two – what – what Lormand

> could get from Breaux was to put him in the – in the hot seat about
> the blackmail . . .

[rec. doc. 85, Exhibit B, pp. 61-62].

Here, Boylston testified that Lormand was blackmailing Whitney's bank officer,

Breaux, to "give us whatever we wanted." [rec. doc. 85, Exhibit B, p. 61].  While there is

no actual evidence that such a blackmail scheme existed, Lormand apparently believed

that it did, and was all too willing to benefit from the illegality.  Under the clean hands

doctrine, therefore, Boylston cannot maintain a defense/counterclaim if he has to rely on

an illegal or immoral act, namely blackmail, to avoid repaying his debt to the bank.

Furthermore, to the extent that there was a conspiracy to defraud, it appears clear

that Boylston was a willing participant.  Boylston falsely stated on the various loan

applications that he was single when he was in fact married, and that he intended the

Houston townhouse to be his primary residence, when he clearly had no such intention.

Thus, the undersigned finds that Boylston is estopped from claiming that he was

defrauded in order to avoid repaying the promissory note.

## Conclusion

Based on the foregoing reasons, I recommend that the motion for summary

judgment be **GRANTED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties

aggrieved by this recommendation have fourteen (14) days from service of this Report

and Recommendation to file specific, written objections with the Clerk of Court.  A party

may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

September 25, 2010 at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE