RECEIVED

JAN 2 0 2011 🖉

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

WHITNEY NATIONAL BANK                             CIVIL ACTION NO. 09-0059

VERSUS                                            JUDGE DOHERTY

WILLIAM H. BOYLSTON                               MAGISTRATE JUDGE HILL

## MEMORANDUM RULING

Pending before this Court is a Report and Recommendation [Doc. 108] issued by the magistrate judge, in which the magistrate judge recommends the Motion for Summary Judgment [Doc. 85] filed by Whitney National Bank ("Whitney") be granted. Defendant and plaintiff-in-counterclaim Dr. William H. Boylston has filed Objections [Doc. 109] to the Report and Recommendation, arguing the report contains errors of fact and law, and Whitney has filed a response. For the following reasons, this Court AFFIRMS the magistrate judge's recommendation. With the following clarifications noted, this Court concludes the Motion for Summary Judgment filed by Whitney National Bank should be GRANTED in its entirety.

## I.   Factual and Procedural Background

The instant lawsuit contains two components in general terms, an original lawsuit filed by a bank against a customer alleging default on a loan, and a counterclaim by the customer against the bank alleging fraud and conspiracy to commit fraud for "misrepresentations" made by an employee of the bank, which the customer alleges induced him to execute the relevant loan documents and relieves him of his obligation on the loan.

The matter came before the magistrate judge by way of a motion for summary judgment, thus, the Court can make no actual "findings of fact" within that procedural posture. However, the

magistrate judge's Report and Recommendation contains a section entitled "Background," which section contains "findings" which are actually merely the factual background of the case. This Court notes the facts contained within the "Background" are identified by citations to the exhibits accompanying the motion for summary judgment. As the matter comes by way of a motion for summary judgment, it is undisputed it is inappropriate for a Court to make factual findings with respect to disputed facts at this stage of the litigation. However, it is equally clear the parties are required to submit statements of either contested or uncontested facts in connection with their briefs accompanying a motion for summary judgment. Specifically, pursuant to Local Rule 56.1 of this district, Whitney was required to file – and did file – a statement of the material facts as to which Whitney contends there is no genuine issue to be tried [Doc. 85-18]. *See* Local Rule 56.1. Dr. Boylston filed none. In response to Whitney's filing, Dr. Boylston was required to file a statement of material facts as to which there exist a genuine issue to be tried. *See* Local Rule 56.2. Rule 56.2 further prescribes "all material facts set forth in the statement required to be served by the moving party will be deemed admitted, for purposes of the motion, unless controverted as required by this rule."

As noted, Dr. Boylston did not file a statement of material facts as to which there exists a genuine issue to be tried, nor did he controvert any of the material facts or exhibits as set forth by Whitney by appropriate evidence.[1] Therefore, pursuant to the local rules, the material facts as set forth by Whitney would be deemed admitted.

Notwithstanding his failure to file a statement of material facts or to contest the particular

---

[1] This Court took the initiative to contact counsel in this matter, asking to be directed to the location in the record of Dr. Boylston's material facts. In response, a member of Dr. Boylston's counsel's staff directed this Court to the scheduling order in this matter, the report and recommendation of the magistrate judge, and the statement of undisputed facts submitted by Whitney.

*facts* or to meet the exhibits submitted by Whitney with acceptable evidence, Dr. Boylston has filed numerous "objections" to certain statements made by the magistrate judge within the "Background" section of the Report and Recommendation, as well as "objections" to certain legal conclusions made by the magistrate judge. It is unclear to this Court whether Dr. Boylston's objections are intended to be factual, legal, or a mix of both, as Dr. Boylston presents his objections as argument and has failed to identify which, if any, of the *facts* alleged by Whitney as uncontested might be contested, and which legal conclusions of the magistrate judge he might be challenging. However, because of the potential for confusion, and to protect against a possible unjust result, this Court will, nonetheless, address Dr. Boylston's submissions as they relate to the material facts and applicable law at issue.

In the original lawsuit filed by Whitney against Dr. Boylston, a medical doctor who practices in Houston, Texas, Whitney alleges Dr. Boylston executed, among others, a Promissory Note dated September 7, 2007, which evidences a revolving line of credit not to exceed $250,000.00. Whitney alleges Dr. Boylston defaulted on the Promissory Note and is, pursuant to the documents at issue, liable for the principal amount due in the amount of $246,644.14, plus all accrued, unpaid interest running to the date of actual payment by Dr. Boylston, all costs of pursuing the collection action, and reasonable attorneys' fees.

Dr. Boylston filed an Answer and Counterclaim to Whitney's lawsuit on February 6, 2009 [Doc. 6]; Dr. Boylston filed an Amended Answer and Counterclaim on May 29, 2009 [Doc. 33]. In his Amended Answer, Dr. Boylston **admits** he executed the Promissory Note, however, in his Amended Counterclaim, Dr. Boylston sets forth a series of facts he alleges support his **claims of fraud and conspiracy to commit fraud against Whitney** and, therefore, argues he is not liable for

3

the amounts due under the Promissory Note or the other amounts argued by Whitney as owing.

Based upon the record, the undisputed facts as set forth by Whitney – which are deemed admitted in light of Dr. Boylston's failure to contest those facts – and with full consideration of the particular "objections" filed by Dr. Boylston, this Court notes the following facts are undisputed: Dr. Boylston borrowed money from Whitney on several occasions. On **February 6, 2007**, Dr. Boylston **executed a promissory note** to Whitney in the amount of $100,000.00 to secure a revolving line of credit. On February 16, 2007, Dr. Boylston, as a co-borrower with a friend, Douglas Lormand, executed a promissory note in the amount of $239,200.00 for the purchase of a townhouse at 1527 Lawrence Street in Houston. Whitney took a mortgage on the property to secure the loan. Thereafter, Whitney sold the mortgage on the Houston townhouse to Chase Bank.

Approximately six months later, on **September 7, 2007**, Dr. Boylston executed **another promissory note** in order to increase his line of credit with Whitney from $100,000.00 to $250,000.00. This latter promissory note is the subject of the instant litigation. Under the terms of the latter note, Dr. Boylston **promised to repay** Whitney **no later than September 6, 2008**. By cashier's check **payable to Chase Bank** and **endorsed by Dr. Boylston**, dated **September 10, 2007**, Whitney made two **advances to Dr. Boylston** on the September 7, 2007 note – one in the amount of $7,649.00 and the other for $239,594.99 – for a total of $247,243.99. **Both of these checks** were **endorsed on the reverse side by Dr. Boylston**, and Dr. Boylston has **admitted the signatures were his**. About **one month later**, Chase Bank issued a **release of the mortgage on the townhouse** co-owned by Dr. Boylston and Mr. Lormand, a friend of Dr. Boylston. Approximately **two months after the release**, Dr. Boylston **transferred his interest in the townhouse** to Mr. Lormand.

Although Dr. Boylston raises an objection questioning and/or disputing whether Whitney or

4

Chase Bank technically owned the mortgage on the Houston townhouse at the time the mortgage was released, the foregoing fact, while possibly *relevant*, is not *material* to the issue of the elements required **for fraud. Whether Whitney or Chase Bank owned the mortgage, it is undisputed Dr. Boylston endorsed the backs of the cashier's checks made payable to Chase Bank, the lender who released the mortgage, and two months later, after Chase had released the mortgage, –** ***thus, at a time when neither Whitney nor Chase Bank were parties to any transaction involving Dr. Boylston*** **– Dr. Boylston transferred his interest in the Houston property, now free and clear of a mortgage by either bank, to Mr. Lormand.** It is undisputed Chase released the mortgage and Dr. Boylston's signature endorsed the checks made payable to Chase, which preceded the release of the mortgage by Chase. Additionally, to the extent Dr. Boylston argues Whitney has not explained "how it knew to make the checks payable to Chase Bank," this Court again notes the foregoing objection begs the question, **as Dr. Boylston admits the signature endorsing the checks, made payable from Dr. Boylston's line of credit, to Chase, and used to pay off the mortgage on the Houston property, is his signature.** Thus, even if this Court were to assume Dr. Boylston did not instruct Whitney to cut the check to Chase, Dr. Boylston cannot escape the admitted facts **that he endorsed those same checks, checks made payable to Chase, the holder of the mortgage on the Houston Property, and, some few months later Chase released the mortgage on the Houston property, a fact known by Dr. Boylston, as soon thereafter Dr. Boylston transferred his interest in the Houston property to Mr. Lormand – something he could not have done so long as the mortgage showing co-ownership by Dr. Boylston and Mr. Lormand existed.** Thus, Dr. Boylston's argument on this point is not persuasive. Furthermore, Dr. Boylston bears the ultimate burden at trial on his claim of fraud, thus, Dr. Boylston's argument, also, is an improper

5

attempt on the part of Dr. Boylston to shift the burden of proof *on his fraud claim* to Whitney. The burden in connection with Dr. Boylston's fraud claim is on Dr. Boylston, not Whitney. Therefore, that the Bank has failed to "show how it knew to make the cashier's checks payable to Chase Bank and how it knew to make the checks payable in specific amounts" is not fatal to Whitney's motion for summary judgment. Indeed, **Whitney need only argue an absence of evidence of fraud**. At that point, the burden shifts to Dr. Boylston, whose ultimate burden it is at trial to prove his claim of fraud, to bring forth evidence to support his claims; something Dr. Boylston has failed to do.

Dr. Boylston has presented *no evidence* of fraud, only argument and conjecture. **Indeed, it is undisputed the line of credit in question was Dr. Boylston's line of credit. It is undisputed Dr. Boylston endorsed the checks made payable to Chase Bank. It is undisputed the signatures on the backs of both payouts on the line of credit were Dr. Boylston's; it is undisputed the mortgage on the Houston property was paid with those funds; and it is undisputed that approximately two months after the release of the mortgage on the Houston property, Dr. Boylston transferred his interest in the townhouse to Mr. Lormand.** As Dr. Boylston does not dispute the fact that payments on the line of credit – with Dr. Boylston's endorsement – were made, Dr. Boylston's objection concerning whether Whitney or Chase Bank owned the mortgage and why Whitney cut checks **which Dr. Boylston endorsed and from which Dr. Boylston benefitted**, i.e. the mortgage on the Houston property was retired, does not raise a material issue or issues of disputed fact for trial on either Whitney's claim on the note, or Dr. Boylston's defense of fraud.

With the foregoing in mind, this Court turns it attention to the magistrate judge's Report and the remaining specific objections made by Dr. Boylston.

6

## II.     The Magistrate Judge's Report and Recommendation

In his Report and Recommendation, the magistrate judge concluded Whitney meets its burden of proof on its claim for breach of the promissory note, and further concludes Dr. Boylston fails to present affirmative evidence of fraud as required under the law so as to defeat Whitney's properly-supported motion for summary judgment.   The magistrate judge, also, concluded Dr. Boylston is estopped from asserting a counterclaim for fraud in an attempt to avoid repayment of the promissory note in question on grounds Dr. Boylston has unclean hands, as Dr. Boylston has admitted he **believed** he was benefitting from the alleged fraudulent scheme that allowed him to borrow the money in question from Whitney.

## III.    Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1), "[a] judge of the court shall make a *de novo* determination of those portions of the [magistrate judge's] report [and recommendation] or specified proposed findings or recommendations to which objection is made."  Section 636(b)(1) further states "[a] judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions."  Therefore, this Court makes a *de novo* review of the portions of the magistrate judge's report to which the defendant objects. *See Hernandez v. Estelle*, 711 F.2d 619, 620 (5th Cir. 1983).

## IV.    Assignments of Error

### 1.     Whitney's Claim on the Promissory Note

In its motion for summary judgment, Whitney argues it is entitled to judgment as a matter of law on its claim for breach of promissory note, and in support of its motion, has presented

7

evidence regarding each element at issue in order to prevail at a trial on that claim. In response, Dr. Boylston presents no evidence challenging the existence of the note, the fact that he signed the note, the fact that Whitney legally owns and holds the note, the fact that a default on the note occurred, and the fact that a balance remains due and owing by Dr. Boylston. Therefore, the magistrate judge concludes Whitney is entitled to judgment as a matter of law unless Dr. Boylston can show the existence of a triable issue of fact, or evidence of the existence of an affirmative defense releasing Dr. Boylston from that obligation. This Court agrees.

In response to Whitney's motion for summary judgment, Dr. Boylston seeks to avoid repayment of the note arguing the affirmative defense of fraud. Dr. Boylston bears the burden of proof with respect to his claim at trial, therefore, once Whitney demonstrates an absence of evidence as to that claim of fraud by Whitney, Dr. Boylston must come forward with sufficient evidence to establish a dispute as to a material fact or evidence to support his claim of fraud by Whitney. As Whitney does not bear the ultimate burden of proof on the fraud claim, Whitney need only show *an absence of evidence* and need not initially present evidence as to Dr. Boylston's claim of fraud, rather need only present undisputed evidence of the existence of the debt and the default – all of which Whitney has done, and an absence of evidence as to the claim of fraud, again, which Whitney has done.

## 2.    Dr. Boylston's Counterclaim for Fraud

The magistrate judge concluded Whitney has carried its burden to establish an absence of evidence of fraud on Whitney's part, and that Dr. Boylston has not presented sufficient evidence of fraud to withstand Whitney's properly-supported motion for summary judgment. Dr. Boylston objects to certain statements made by the magistrate judge in his Report however, presents only

8

argument to support those objections. Many of the objections lodged by Dr. Boylston are not material to the issue of fraud, including the following:

Dr. Boylston objects to the magistrate judge's statement that "Lormand told Boylston that he, Lormand, would introduce Boylston to Byron Breaux ("Breaux"), vice president and manager of commercial banking at Whitney to make the financial arrangements." In his Objections, Dr. Boylston argues Mr. Lormand was not offering to introduce Dr. Boylston to Mr. Breaux, and the distinction is important because "Mr. Lormand was the only person that anyone at the Bank, including Mr. Breaux, ever dealt with concerning the financial matters at issue herein." Whitney argues the foregoing statement is not accurate, noting Dr. Boylston attended every loan closing on loans he made with Whitney and provided loan information to a Whitney representative by telephone in connection with the loan that is the subject of Whitney's lawsuit against Dr. Boylston. However, Whitney acknowledges the finding, as written by the magistrate judge, is not technically accurate, because, in his testimony, Mr. Lormand did not state he, in fact, offered to introduce Dr. Boylston to Mr. Breaux. Nevertheless, Whitney argues a slight modification of the language in the Report and Recommendation cures the problem. This Court agrees the magistrate's finding is, as written, disputed, factually, and thus, Dr. Boylston's objection is SUSTAINED, however, accepting Dr. Boylston's factual distinction and argument does not impact the result.

The magistrate judge Report's and Recommendation states as follows:

**Lormand told Boylston that he, Lormand, *would introduce Boylston to Byron Breaux* ("Breaux"), vice president and manager of commercial banking at Whitney, to make the financial arrangements.**

This Court concludes the Report and Recommendation should be modified to read:

**Lormand** *introduced to Boylston the subject of Byron Breaux ("Breaux"), vice president and manager of commercial banking at Whitney, who could help with making* **financial arrangements.**

As modified, the factual finding is not disputed.

Dr. Boylston further objects to the magistrate judge's statement that "[o]n several occasions, Lormand stayed at the home in Lafayette in which Breaux and his wife resided" – this Court concludes accepting the sentence as written does not materially affect the magistrate judge's recommendation or this Court's determination. However, the Court notes, Dr. Boylston has not provided this Court *with evidence to dispute the factual statement*. Therefore, this objection is OVERRULED, but again, notes that even if the Court were to accept Dr. Boylston's argument as properly presented fact, the outcome would remain the same.

Dr. Boylston also objects to the magistrate's judge's statement that Dr. Boylston "negotiated" with Whitney before executing the Allonge on October 24, 2008. The record shows when payment on the $250,000 promissory note became due, Dr. Boylston did not pay it. At that point, Dr. Boylston began discussions with Gary Theobald, a Whitney employee in Houston, Texas about the loan's repayment. At some point, Dr. Boylston executed an Allonge, which extended the note's terms and which required Dr. Boylston to pay interest due on the loan by October 6, 2008. Dr. Boylston does not dispute any of the foregoing facts, but appears only to challenge the magistrate judge's *characterization* of the foregoing undisputed facts as a "negotiation" between Dr. Boylston and Whitney. This Court need not determine whether the noted undisputed facts constitute a "negotiation" or not, as it is the facts themselves which are relevant, not the possible characterization of those facts. This Court concludes the objection is without merit, and this objection is

10

OVERRULED.

Additionally, Dr. Boylston objects to the weight given by the magistrate judge to Mr. Breaux's affidavit, in which Mr. Breaux denies he conspired with Mr. Lormand to defraud Dr. Boylston. However, as this Court has pointed out, the burden is on Dr. Boylston with respect to his counterclaim for fraud, not on Whitney. Whitney presented the affidavit of Mr. Breaux, who attests he did not conspire with Mr. Lormand against Dr. Boylston, which demonstrates *an absence of evidence* to prove Dr. Boylston's counterclaim for fraud. The burden then shifts to Dr. Boylston *to present evidence of a conspiracy* to defraud Dr. Boylston. Considering the foregoing, it was not error for the magistrate judge to consider Mr. Breaux's affidavit in determining whether Whitney had carried its burden to show an absence of evidence to support Dr. Boylston's claims of fraud against Whitney. Consequently, this Objection is OVERRULED.

Furthermore, Dr. Boylston objects to certain aspects of Mr. Breaux's testimony, including Mr. Breaux's description of Kenray Landry, a commercial loan officer at Whitney, as his colleague, and Mr. Landry's approval of three commercial loans to Dr. Boylston. Because this objection does not concern facts that are relevant or material to the resolution of the motion before the Court, Dr. Boylston's objections as to what description might or might not be used to describe *the fact of Kenray Landry's involvement,* a fact not questioned by the magistrate judge or Dr. Boylston – and which is accepted by this Court – such objections on these points are OVERRULED.

This Court concludes the following objections however, are material to this Court's determination:

Dr. Boylston objects to the magistrate judge's statement that Dr. Boylston "checked a blank" on a loan application indicating Dr. Boylston was unmarried; objects to the magistrate judge's

11

statement that Dr. Boylston appeared on legal documents as "single man," when that was, in fact, false; and objects to the magistrate judge's failure to discuss the fact that Whitney and Whitney's lawyer knew Dr. Boylston was married, but prepared legal documents showing Dr. Boylston was not married.  The foregoing objections concern the issue of Whitney's knowledge of Dr. Boylston's marital status, that is, whether Whitney "knew" Dr. Boylston was married, but allowed loan documentation stating Dr. Boylston was single to be processed, and the relevance, if any, of that fact. Dr. Boylston alleges Whitney's "knowledge" in this regard creates a genuine issue of material fact concerning whether Whitney colluded with Mr. Lormand to defraud Dr. Boylston.

Whitney responds while it is true Dr. Boylston did not personally "check a blank" on a loan application indicating he was single when he was, in fact, married, the evidence is undisputed the loan application in question was filled out by Patricia Reynolds, an employee of Whitney, while she interviewed Dr. Boylston by telephone, a fact Dr. Boylston does not dispute.  However, it, also, is undisputed the **application** itself was **signed by Dr. Boylston twice**, and Dr. Boylston does not argue the telephone conversation did not happen, nor that he did not provide information to Ms. Reynolds while she filled out the application, and that the application, in fact, shows Dr. Boylston as a "single man."  Therefore, to the extent the Report and Recommendation should more properly reflect the foregoing – and not that Dr. Boylston actually "checked a box" indicating he was or was not married -- this objection is SUSTAINED, and the Report is modified to more accurately state the undisputed facts.  However, again for the reasons explained below, even accepting that fact as true does not, again, change the outcome, as the fact is not *material* to the proof of fraud.

Dr. Boylston argues Dr. Boylston appeared on legal documents as "single man," when that was, in fact, false and this fact is evidence of Whitney's bank fraud and collusion with a non-

12

employee, Mr. Lormand.  Whitney argues the objection itself, is incomprehensible, and this Court tends to agree.  However, it is undisputed Dr. Boylston appears on certain loan documents as a "single man" at a time when he was, in fact, married.  However, those specific facts are not disputed, i.e. that Dr. Boylston was married, and certain of the loan documents showed him as a "single man;" thus, this objection to the magistrate judge having noted these undisputed fact is OVERRULED.  However, as best this Court can determine, this does not fully address Dr. Boylston's argument couched within his objection.

With respect to Dr. Boylston's argument as to the significance of the facts, i.e. that the magistrate judge failed to discuss the fact that Whitney and Whitney's lawyer knew that Dr. Boylston was married, but prepared legal documents showing Dr. Boylston was not married and thus, there exists evidence of fraudulent collusion, Whitney responds that Dr. Boylston has presented no *evidence* showing *Mr. Breaux, a Whitney employee,* Phillip Boudreaux, *Whitney's attorney,* or *anyone at Whitney knew* Dr. Boylston was married, *but knowingly processed Dr. Boylston's loan documents identifying Dr. Boylston as a single man.*  This Court agrees; this Court has painstakingly reviewed the undisputed evidence and all exhibits presented on this point beginning with the actual deposition testimony of Mr. Boudreaux, who testified that in Dr. Boylston's loan file, there was a credit memo indicating Dr. Boylston was married,[2] while, also, in the loan file was loan documentation indicating Dr. Boylston was single.[3]  Mr. Boudreaux testified he has no independent recollection of what he did to investigate this possible discrepancy, but testified he ordinarily would

---

[2] *See* deposition of Philip Boudreaux, attached as Exhibit "D" to Dr. Boylston's opposition to Whitney's motion for summary judgment, Doc. 90, at p. 35, l. 3-12.

[3] *Id.*

have asked his assistant to confirm the information contained in the loan documentation.[4]   Mr.
Boudreaux specifically could not remember whether he did or did not request such confirmation for
Dr. Boylston's $250,000 loan, which is the subject of this lawsuit.[5]   Therefore, the *evidence* Dr.
Boylston has presented is that within the complete loan file on Dr. Boylston, which encompassed
several financial transactions over a period of time, there existed documentation which on its face,
presented seemingly conflicting information as to Dr. Boylston's marital status at certain points in
time. Contrary to what Dr. Boylston argues, however, **there is no evidence in the record that Mr.
Boudreaux *actually knew* Dr. Boylston was married or was not married at the time of Dr.
Boylston's loan closing, nor has Dr. Boylston presented *evidence* suggesting Dr. Boylston
informed Mr. Boudreaux the paperwork was in error and needed to be corrected, nor is there
any evidence or legal support for an argument the marital status was legally relevant to
extension of the line of credit loans**. Rather, Mr. Boudreaux had information stating Dr. Boylston
was married *at the time the credit report was generated* and information documenting Dr. Boylston
was not married *at the time the loan documentation was prepared*.  The foregoing does not, as Dr.
Boylston argues, alone on its face, constitute evidence that Mr. Boudreaux, as the attorney for
Whitney, or Mr. Breaux, a Whitney employee, *knew* Dr. Boylston was married or was not married
when Dr. Boylston signed documents prepared by Whitney.  Indeed, Dr. Boylston's marital status
could have changed from the date the credit memo was prepared to the date the loan documentation
was filled out, *e.g*, Dr. Boylston could have gotten divorced, or his wife could have died, and
Whitney would have no reason to question such a change.  Furthermore, the possible discrepancy

---

[4] *Id.* at pp. 35-36.

[5] *Id.* at p. 36, l. 16-25.

in marital status on the two documents, on its face, is not evidence of fraud on the part of Whitney. However, more significantly, Dr. Boylston *failed* to present *actual knowledge,* by Whitney or anyone acting on Whitney's behalf, of a deliberate misstatement of fact on the loan documents, and also, has not presented sufficient evidence for this Court to presume Whitney *should have known* of the discrepancy such that this Court could make a reasonable inference the seemingly conflicting entries were deliberate on Whitney's part. The presumptions and inferences inherent in this argument are not supported by *the evidence* Dr. Boylston presents at each level of the argument.

Moreover, Dr. Boylston has not alleged the law of agency; therefore, *even if this Court were to assume Mr. Breaux*, who Dr. Boylston, himself, argues was also being blackmailed by Lormand, *knew Dr. Boylston was married*, but allowed Dr. Boylston to borrow money from the bank as a single man, *the foregoing knowledge cannot be imputed to anyone else at Whitney or to Whitney, as a juridical entity*, as Dr. Boylston, himself, argues Breaux was being blackmailed into improper action. Consequently, this objection is OVERRULED.

Dr. Boylston objects to the magistrate judge's finding that Dr. Boylston has failed to present any specific admissible facts showing the existence of a conspiracy between Whitney and Mr. Lormand or that Dr. Boylston was induced to sign the note or obtain advances from Whitney as a result of fraud. In support of his objection, Dr. Boylston presents argument, couched as four "facts" that he claims are demonstrated by evidence in the record which show the existence of a conspiracy between Whitney and Mr. Lormand:

1. Mr. Breaux, an employee of Whitney, knew Mr. Lormand was not married when Mr. Lormand signed documents prepared by the Bank and the bank's attorney, which showed Mr. Lormand was married;

2. Mr. Breaux knew Dr. Boylston was married when Dr. Boylston signed documents

15

prepared by the Bank and the Bank's attorney, Philip Boudreaux, which showed Dr. Boylston was not married;

3.    Mr. Breaux knew the loan proceeds of the $250,000 loan were being used to retire the mortgage on the Houston townhouse while at the same time telling Mr. Landry the purpose of the loan for loan documentation purposes was to "finance business investments."

4.    Mr. Lormand testified Mr. Beaux knew the purpose of the loan was to retire the mortgage on the Houston townhouse.

With respect to the first category of "evidence," Whitney responds that Dr. Boylston has not presented any *evidence* in the record – and, indeed, Dr. Boylston has not – indicating Mr. Breaux knew *Mr. Lormand* was not married in 2005 when *Mr. Lormand's*[6] first loan transaction with Whitney occurred. Whitney, also, argues there is no *evidence* in the record – and, indeed, Dr. Boylston points to none – to suggest Mr. Breaux participated in the drafting of closing documents related to *Mr. Lormand's* loans, attended Mr. Lormand's loan closings, or reviewed any documents in such detail prior to the advent of this litigation. Thus, Dr. Boylston has not met his burden to present otherwise admissible evidence or persuasive argument to meet Whitney's well supported motion and evidence. With respect to the second category of "evidence" – Whitney's knowledge of Dr. Boylston's marital status – the parties are referred to pages 11-16 of this Ruling, wherein the Court addresses a similar objection.

With respect to the third category of "evidence," Whitney responds that Dr. Boylston repeatedly represented to Whitney the purpose of the $250,000 loan – the subject of the instant litigation – was to finance "a business investment," and Whitney took Dr. Boylston at his word. Whitney argues although Dr. Boylston now objects to this fact, he has presented no *evidence* that the

---

[6] Apparently, Mr. Lormand had prior financial transactions with Whitney that are not the subject of this lawsuit.

loan was not for business investments, and, indeed, testified at his deposition that "anything I signed was in the service of a business relationship that I had with Mr. Lormand...It was all business,"[7] thus, Dr. Boylston's "objection" has no merit. This Court agrees; Dr. Boylston admits he categorized "anything he signed" as being in the "service of his business" and Whitney took him at his word.

Whitney argues the only *evidence* presented by Dr. Boylston that has any basis in the record is the fourth category of evidence. Dr. Boylston argues Mr. Beaux knew the purpose of the $250,000 loan was to retire the mortgage on the Houston townhouse rather than to "finance business investments" as the loan documentation stated. However, even with respect to this "fact," the fact alone does not support Dr. Boylston's argument. The Houston townhouse could certainly have been used in the service of Dr. Boylston's business in many ways – only Dr. Boylston would have had the knowledge of his true intent as to its use and Dr. Boylston consistently characterized "anything I [he] signed was in the service of a business relationship I have with Mr. Lormand," and, in fact, Mr. Lormand was shown as a co-owner of the mortgaged property *until after the mortgage was released* and thereafter, in fact, Dr. Boylston, voluntarily, transferred his ownership interest in the Houston townhouse to Mr. Lormand. Furthermore, this Court's review finds the actual deposition testimony argued by Dr. Boylston does not support Dr. Boylston's argument. In his Objections, Dr. Boylston argues "Lormand testified that Breaux knew that the purpose of the $250[,000] Loan was [to] retire the mortgage on the Houston townhouse." However, the actual testimony is as follows:

Q:     Did you talk to Mr. Breaux about this loan?

A:     I don't remember.

---

[7] *See* deposition of Dr. Boylston, attached as Exhibit "B" to Whitney's motion for summary judgment, Doc. 89, at p. 66, ll. 5-10.

Q:     And this was February of '07, and you were still tennis playing buddies with Mr. Breaux, right?

A:     Let – let me re-state that.  Yes, I do remember talking to Byron [Breaux] about this – this loan.

Q:     Okay.

A:     I do.

Q:     And what did you talk to him about?

A:     I relayed the – the request for Dr. Boylston to have his name removed from the title so his wife would not find out about it, and to – okay.

Q:     All right.  I think you might be confused.  This is a Hundred Thousand Dollar ($100,000.00) loan prior to the – the home you purchased.

A:     Okay.

Q:     Okay.

A:     Let's –

Q:     It's just the Hundred Thousand Dollar ($100,000) line of credit loan prior to the home being purchased.  What do you recall talking to either Mr. Landry or Mr. Breaux about with respect to this Hundred Thousand Dollar ($100,000.00) line of credit loan?

A:     I'm glad you made that point.  I don't recall having any – any information or being involved in this one.  I think that this was – was Dr. Boylston borrowed this money as a down payment.

Q:     Okay.[8]

Therefore, the testimony cited by Dr. Boylston to support his argument does not refer to the $250,000 loan, which loan is the subject of the instant lawsuit.  Rather, as clarified in Mr. Lormand's testimony, the foregoing testimony refers *to a prior line of credit taken out by Dr. Boylston.*  As

---

[8] *See* deposition of Douglas Lormand, attached as Exhibit "A" to Dr. Boylston's opposition brief, pp. 171-72.

18

Whitney points out, the questioner did not go back and ask the same question – *e.g.*, "what did you talk about with Mr. Breaux" – with respect to the $250,000 loan.  Additionally, Dr. Boylston's argument is that Whitney – through Mr. Breaux – was conspiring with Mr. Lormand **to Dr. Boylston's benefit,** i.e. acting to remove the joint ownership of Mr. Lormand and Dr. Boylston from the public record, for whatever reason.  The cited testimony, however, shows only that Mr. Lormand relayed "the request for Dr. Boylston to have his [Dr. Boylston's] name removed from the title so his [Dr. Boylston's] wife would not find out about it, . . ."  Something Dr. Boylston desired, for whatever reason, and the cited testimony notes that desire, for whatever reason, was presented as Dr. Boylston's request.  Therefore, after reviewing the cited testimony of Mr. Lormand, this Court concludes the testimony does not support Dr. Boylston's argument made in his objection.

Dr. Boylston points to no other evidence to support his argument that "he has shown that the Bank did this so Breaux's intimate friend, Lormand, could get Boylston to participate in the loans eventually to Boylston's detriment and Lormand's benefit."  Dr. Boylston **points to no evidence of knowledge on the part of Mr. Breaux or any other Whitney employee or attorney** of any fraudulent collusion.  The *argument* advanced by Dr. Boylston is not supported by *evidence*; Dr. Boylston presents no *evidence* sufficient to rebut Whitney's argument that there is an *absence of such evidence.* **Dr. Boylston cannot ignore the fact that it is undisputed the line of credit in question was Dr. Boylston's line of credit; that it is undisputed checks were cut from that line of credit made payable to Chase; that Dr. Boylston's signature endorses the checks made payable to Chase Bank; that it is undisputed Dr. Boylston admits the signatures on the backs of both payouts on the line of credit were Dr. Boylston's; that Chase upon receiving those checks released the mortgage on the Houston property shown as co-owned by Dr. Boylston and Mr.**

19

**Lormand; and that it is undisputed approximately two months after the release of the mortgage by Chase on the Houston property – at a time when neither Whitney nor Chase was any longer involved in any financial transactions with Dr. Boylston – Dr. Boylston transferred his interest in the townhouse to Mr. Lormand.** Therefore, this Court concludes the magistrate judge correctly concluded there is no evidence in the record showing the existence of a conspiracy between Whitney and Mr. Lormand to defraud Dr. Boylston or that Dr. Boylston was induced to sign the note for the $250,000 loan or obtain advances from Whitney as a result of fraud.

Dr. Boylston also objects to the following statement of the magistrate judge:

It certainly does not mean that the holder of the note used to finance the transactions was in any way a participant in a conspiracy to defraud Boylston.

This Court has already addressed the lack of evidence presented by Dr. Boylston to prove his claim that Whitney and Mr. Lormand colluded to defraud Dr. Boylston. Consequently, this objection is OVERRULED.

Similarly, Dr. Boylston also objects to the following statement of the magistrate judge:

"Furthermore, there is no evidence in this record that Boylston was induced to sign the note or obtain the advances as a result of fraud."

To support his argument that the foregoing statement is erroneous, Dr. Boylston points to the following deposition testimony of Mr. Lormand:

Q:      In August of '07, we see that there's activity with respect to a new loan being made by Whitney to Dr. Boylston to basically pay off the mortgage on the Lawrence Street property [$250[K] Loan]...Now, who initiated that and why?

*A:      Dr. Boylston initiated that.*

Q:      Okay.  But why would he want to do that?

        [ . . . ]

A:      I was dating a lady that worked for the Clerk of Court's office in Houston....
..after I took her out a couple of times, she ran a background check on me and
found out that William H. Boylston and myself owned a house at 1527
Lawrence...she basically made a comment about – she said, you know, in the
Heights it's known for gays, and she said, you know, you have a rainbow
over that house.  And I brought that to the attention of Dr. Boylston...and Dr.
Boylston made a comment that if my wife finds out, if anybody can run that,
and my wife finds out, it's over for me.  *So I'm gonna take my name off of
that.*  How can we take my name off of that, and that's when he had – things
took off and that's how he got his name off of it.

Q:      So you have a situation where you and he had a discussion about how he
could get his name taken off?  Is that right?

A:      *I listened to his instructions of how he wanted to take his name off of that
property.* (emphasis added.)

Dr. Boylston argues in the foregoing testimony, Mr. Lormand "has testified that he set up

Boylston by getting Boylston concerned that someone could find out that Boylston owned the

Houston townhouse with Lormand.  Lormand, like a good con man, led Boylston to believe that

Boylston had a problem and that Lormand could solve the problem by assisting Boylston in getting

a loan from Lormand's good friend Breaux."  Dr. Boylston goes on to argue that Dr. Boylston's

deeding the townhouse to Mr. Lormand is consistent *with Mr. Lormand's fraud,* because *Mr.

Lormand* convinced Dr. Boylston that Dr. Boylston needed to transfer ownership of the townhouse

in order to hide Dr. Boylston's joint ownership of the house with Mr. Lormand from Dr. Boylston's

wife.  Dr. Boylston argues the third step the fraud was Mr. Lormand's declaring that the ownership

transfer was not simply a vehicle by which Dr. Boylston could hide his ownership in the townhouse

from his wife, but was, in fact, a gift from Dr. Boylston to Mr. Lormand.  All of which might or

might not be accurate – **as to Mr. Lormand – however, there is no evidence the alleged conduct**

**by Mr. Lormand was joined in by any Whitney employee or attorney with knowledge of the**

**scheme or the intent to defraud.**

This Court first notes Dr. Boylston does not challenge the factual content of the foregoing testimony or suggest that the conversation between Mr. Lormand and the woman he was dating around August 2007 did not occur. Additionally, the cited testimony, however, does not, on its face, include testimony that Mr. Lormand "set up" Dr. Boylston *with anyone from or representing Whitney or with their knowledge*. The testimony recounts – under oath – a conversation between Mr. Lormand and a friend, the substance of which was relayed to Dr. Boylston by Mr. Lormand, and which, according to Mr. Lormand, aroused concern in Dr. Boylston about the possibility of his [Dr. Boylston's] wife – or anyone else – being able to search public title records showing Dr. Boylston and Mr. Lormand owned a house together. The testimony stands for that and only that. Dr. Boylston's argument that the foregoing testimony shows an attempt to "set up" Dr. Boylston *with Whitney's involvement or knowledge* is wholly unsupported. It is not borne out by the face of the testimony or supported by any other evidence, and as such Dr. Boylston's argument constitutes speculation only, an "unsubstantiated assertion." Consequently, Dr. Boylston has not presented sufficient evidence to withstand summary judgment, and this objection is OVERRULED.

### 3.    The Doctrine of Clean Hands

In addition to finding Dr. Boylston has presented no evidence of fraud *on the part of Whitney, as opposed, perhaps, to Mr. Lormand*, in connection with the $250,000 loan, the magistrate judge concluded Dr. Boylston would not, as a matter of law, be entitled to recovery of any kind on his counterclaim for fraud, as against Whitney, because the clean hands doctrine bars any such recovery. Dr. Boylston objects.

Whitney pled the doctrine of clean hands as an affirmative defense in its answer to Dr.

Boylston's Amended Counterclaim asserting fraud on the part of Whitney. An affirmative defense raises a new matter, which assuming the allegations in the petition are true, constitutes a defense to the action. *Allvend, Inc. v. Payphone Commissions Co., Inc.*, 804 So.2d 27, 30 (La. App. 4th Cir. 2001, *citing Gulf V, Inc. v. Hibernia Nat.Bank*, 749 So.2d 722. (La. App. 5th Cir. 11/10/99). An affirmative defense is one that will have an effect of defeating a suit on its merits. *Allvend*, 804 So.2d at 30, *citing Walters v. Metropolitan Erection Co.*, 644 So.2d 1143 (La. App. 4th Cir. 2004), *writ denied*, 649 So.2d 420 (La. 2005). The party pleading an affirmative defense has the burden of proving it by a preponderance of the evidence. *Abadie v. Markey*, 710 So.2d 327 (La. App. 5th Cir. 1998. Generally, an affirmative defense must be pleaded or it is waived. *Sommer v. Dept. of Trans. and Development*, 758 So.2d 923 (La. App. 4th Cir.), *writ denied*, 772 So.2d 122 (La. 2000).

The clean hands doctrine is recognized as a defense in Louisiana; **a person cannot maintain an action if, in order to establish his cause of action, he must rely in whole or in part, on any illegal or immoral act or transaction to which he is a part.** *Allvend*, 804 So.2d at 30, *citing Guillie v. Comprehensive Addict. Programs*, 735 So.2d 779(La. App. 4th Cir. 1999)(emphasis added).

In the instant case, Whitney bears the burden of proving its affirmative defense of unclean hands. Whitney asserts Dr. Boylston should not be allowed to assert fraud/conspiracy as a defense or counterclaim to Whitney's claim of breach of the promissory note because Dr. Boylston has admitted he believed he was benefitting from Mr. Lormand's alleged blackmail of Mr. Breaux. The magistrate judge agreed. In so agreeing, the magistrate judge focused on the following testimony of Dr. Boylston:

> Q:     . . . So my question to you is what is the basis for your claim against my client, Whitney, that they committed fraud, fraud in the inducement or conspired?

A:      Okay.  The basics of this  – this – this claim is that I've discovered, based on
        ... Mr. Lormand, in explaining to me why – I said, why would Mr. Breaux
        give you whatever you wanted or give us whatever we wanted.  He – Mr.
        Breaux said because I can tell you in his marriage he used escorts to make a
        menage a trois, three, and the wife learned that Mr. Breaux was more
        attracted to the male.  **Mr. Lormand had this information and I guess used
        this as blackmail over Mr. Breaux like he used blackmail over me about
        my wife, and that's what he told me.  So then –**

Q:      I'm sorry. Did – did Mr. Lormand tell you that he had used that information
        as blackmail against Mr. Breaux or are you assuming –

A:      I'm –

Q:      **– you're assuming that he did the same to him he did to you?**

A:      **Yes.**

Q:      Okay.  Okay.  Proceed.  What else besides that?

A:      Okay.  So then I began to see that the two – what – what Lormand could get
        from Breaux was to put him in the  – in the hot seat about the blackmail and
        therefore, Lormand and Breaux, together, could arrange for – to move the
        house from the collateralized loan, which was where – Whitney could easily
        have sold and got that to get us a house for Mr. Lormand free, leaving me out
        and leaving me holding an unsecured note and that was all arranged by the
        Whitney Bank and that was arranged by Byron Breaux.  Fueled, I guess, but
        the knowledge that Douglas Lormand knew.

Q:      You said something very important there, fueled, I guess.  These are all
        assumptions –

A:      Let –

Q:      – that you're making.

A:      Let me – let me retract that. Fueled by the relationship that Mr. Lormand had
        with Mr. Breaux.[9]

The magistrate judge found the foregoing testimony shows although there is no actual

---

[9] *See* deposition of Dr. Boylston, pp. 61-63.

24

evidence, beyond Dr. Boylston's assumptions, that a blackmail scheme actually existed, *Dr. Boylston, nevertheless, believed Mr. Lormand was blackmailing Mr. Breaux, Whitney's bank officer, to "give us whatever we wanted."* The magistrate judge concluded Dr. Boylston's testimony illustrates he was all too willing to benefit from the assumed immorality or illegality when it acted to protect and benefit him, but complains only when the ultimate result is no longer to his liking. Therefore, the magistrate judge concluded under the clean hands doctrine, Dr. Boylston cannot now, maintain a defense/counterclaim for fraud because, by Dr. Boylston's own testimony, to do so, he must rely on the result of an illegal or immoral act, namely Mr. Lormand's assumed blackmail of Mr. Breaux, to avoid repaying his debt to the bank. Again, while there is no evidence of any such blackmail scheme, the magistrate judge concluded *Dr. Boylston* clearly *believed* he was benefitting from such blackmail of Mr. Breaux by protecting him from public knowledge of the joint ownership of the Houston townhouse with Mr. Lormand.

In his Objections, Dr. Boylston however, argues the cited testimony shows Dr. Boylston retracted his testimony concerning blackmail. This Court disagrees. The testimony shows Dr. Boylston did not retract his statements about blackmail. Dr. Boylston first states the "scheme" to defraud him was "[f]ueled . . . by the knowledge that Douglas Lormand knew." Dr. Boylston then retracts *that* portion of the statement and states, "Let me – let me retract that. Fueled by the relationship that Mr. Lormand had with Mr. Breaux."

As an initial matter, however, this Court notes the magistrate judge did not rely on the retracted portion of the testimony in concluding Dr. Boylston believed Mr. Lormand was blackmailing Mr. Breaux. Furthermore, Dr. Boylston did not retract the entirety of his earlier statement that "what Lormand could get from Breaux was to put him in the – **in the hot seat about**

25

the blackmail and therefore, Lormand and Breaux, together, could arrange for – to move the house from the collateralized loan . . ." Rather, Dr. Boylston clarified the "blackmail" in question was "fueled" – or facilitated – *by the relationship* between Mr. Lormand and Mr. Breaux. This Court concludes the difference between the statements Dr. Boylston attempted to clarify contain distinctions without a difference. Clearly, Mr. Lormand's alleged "relationship" with Mr. Breaux would include whatever "knowledge" that Mr. Lormand had about Mr. Breaux, and, **using either phrase, Dr. Boylston testified the foundation of the alleged scheme to defraud him sits upon Mr. Lormand's using the information he had about Mr. Breaux – learned by virtue of his *relationship* with Mr. Breaux – as a means to force Mr. Breaux into Mr. Lormand's "getting whatever he wanted" from a financial standpoint with the bank.** Although there is no evidence in the record beyond Dr. Boylston's testimony, that such a scheme actually existed, Dr. Boylston's testimony makes clear *he believed* such a scheme existed *and was a willing participant* – to the extent he believed he was getting favorable treatment from Mr. Breaux that he might not have gotten otherwise – in the plan. Thus, Dr. Boylston's argument is unpersuasive.

It is Whitney's burden to present evidence supporting its affirmative defense under the clean hands doctrine. Whitney has presented sufficient evidence – in the form of Dr. Boylston's own testimony – that Dr. Boylston did not have clean hands in his dealings with Whitney. In response, Dr. Boylston argues the submitted testimony is not sufficient to prove unclean hands on the part of Dr. Boylston, because Dr. Boylston "retracted" his testimony that he received favorable treatment from the bank because Mr. Lormand was blackmailing Mr. Breaux. Dr. Boylston argues he recanted that testimony and thereafter, stated he received favorable treatment from Whitney only because of Mr. Lormand's "relationship" with Mr. Breaux, again even if this Court were to assume Dr. Boylston

26

recanted as he argues, which this Court does not find, the distinction is one without a difference made. It would seem Dr. Boylston would then be arguing it was an intimate relationship between Mr. Lormand and Mr. Breaux – not blackmail – that gave Mr. Breaux the incentive "to give us whatever we wanted." Under the facts argued by Dr. Boylston, himself – the marital status of Mr. Breaux and Mr. Lormand and the argued illicit relationship or relationships – would seem to be, if not illegal, immoral.

Under the clean hands doctrine, a person cannot maintain an action if, in order to establish his cause of action, he must rely in whole or in part, *on any illegal or immoral act or transaction to which he is a part.* Dr. Boylston's own testimony identifies the private information Mr. Lormand had about Mr. Breaux and the manner in which Dr. Boylston believed Mr. Lormand had used that information to obtain benefits *for both of them based upon Dr. Boylston and Mr. Lormand's relationship – whatever that might have been.* Dr. Boylston has not offered evidence to rebut the evidence presented by Whitney that Dr. Boylston acted with unclean hands. Under these circumstances, this Court concludes the magistrate judge did not err in applying the clean hands doctrine in this matter to defeat Dr. Boylston's claim for fraud.

## III.    Conclusion

In its motion for summary judgment, Whitney seeks the following relief:

Whitney respectfully requests that this Court enter summary judgment in its favor on all claims asserted in this matter:

- granting summary judgment in favor of Whitney and against Boylston on the collection action, awarding Whitney damages in the amount of $246,644.14, together with interest in the amount of $15,792.07 through May 24, 2010 and continuing to accrue at a rate of $22.266465 per diem until paid, costs, and attorneys' fees incurred in collection of this debt; and

27

- granting judgment in favor of Whitney and against Boylston on the affirmative defense and counterclaim for fraud and conspiracy, dismissing those claims in their entirety and at Boylston's costs.

This Court having concluded that Whitney has presented evidence regarding each element of its collection claim in order to prevail at a trial on that claim, and that Dr. Boylston has presented no evidence challenging the existence of the note, the fact that he signed the note, the fact that Whitney legally owns and holds the note, the fact that a default on the note occurred, and the fact that a balance remains due and owing by Dr. Boylston, and furthermore, that Dr. Boylston has presented no evidence that Whitney colluded with anyone to defraud Dr. Boylston, or defrauded Dr. Boylston,

IT IS ORDERED that the Motion for Summary Judgment [Doc. 85] filed by Whitney National Bank ("Whitney") is GRANTED in its entirety. Whitney is entitled to judgment as a matter of law on its claim to recover under the promissory note and is also entitled to judgment as a matter of law on its affirmative defense asserted in response to Dr. Boylston's counterclaim for fraud.

IT IS FURTHER ORDERED that the parties shall present a Judgment, approved as to form by all parties, within ten (10) days of the date of this Memorandum Ruling.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this _____20_____ day of January 2011.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

28